# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF IDAHO

_____

**In Re:**

MICHAEL HARRISON and
JULIE HARRISON (aka Rawls),

       **Debtors.**

**Bankruptcy Case
No. 04-02709**

_____

BARRY BALLEW, an
individual,

       **Plaintiff,**

**vs.**

MICHAEL HARRISON and
JULIE HARRISON (aka Rawls),

       **Defendants.**

**Adv.  Proceeding No. 04-6234**

_____

## MEMORANDUM OF DECISION

_____

**Appearances:**

    Mia Murphy, MURPHY LAW OFFICE, Caldwell, Idaho, Attorney
for Plaintiff.

    Howard R. Foley, FOLEY FREEMAN BORTON, Meridian, Idaho,
Attorney for Defendants.

MEMORANDUM OF DECISION - 1

## Introduction

In this adversary proceeding, Plaintiff Barry Ballew contends that Defendants Michael and Julie Harrison fraudulently misrepresented the location of certain boundary lines when selling their real property to Plaintiff, and that the damages he suffered as a result constitute a debt that should be excepted from discharge in Defendants' bankruptcy case.

The Court conducted a three-day trial at which the parties presented the testimony of several witnesses and submitted dozens of documentary exhibits. After carefully considering all the evidence, testimony and arguments of the parties, the issues are now ripe for disposition. The Court concludes Defendant Michael Harrison's obligations to Plaintiff are indeed excepted from discharge. This Memorandum constitutes the Court's findings of fact, conclusions of law and reasons for its decision. Fed. R. Bankr. P. 7052.

## Findings of Fact[1]

Defendant Michael Harrison was Plaintiff Barry Ballew's friend and business associate; both were involved in various aspects of construction work. When Plaintiff was preparing to return to Idaho from an extended work assignment

---

[1] These findings include both disputed and undisputed facts. In deciding disputed issues of fact, the Court carefully considered the testimony of the witnesses, and based upon its opportunity to observe them testify, assessed their credibility. The Court's findings reflect its judgment on the weight to be given to that testimony.

MEMORANDUM OF DECISION - 2

in Japan, Plaintiff contacted Mr. Harrison about purchasing a home.  Based upon

their communications, when Plaintiff arrived in Idaho, he intended to purchase the

Frye Street house, a house Defendants Michael and Julie Harrison owned.

Plaintiff rented this home from Defendants while attempting to obtain financing

for the purchase price.  During this time, Mr. Harrison informed Plaintiff he had a

more desirable, although more expensive, house Plaintiff should purchase.  This

house was known as 6912 Petrie Street, a property Mr. Harrison himself had

developed.[2]  The lot on which this home was located was represented by Mr.

Harrison to include half of a common driveway used to provide street access to the

property as well as to the neighboring parcel, and a small garage (sometimes

referred to herein as the "shop").   Plaintiff, relying on the representations Mr.

Harrison made when showing Plaintiff the property, agreed to purchase 6912

Petrie instead of the Frye Street house.

As it turned out, less than a year after purchasing the 6912 Petrie

property from Defendants,  Plaintiff discovered the property was not as

---

[2]  A copy of Defendants' Exhibit D admitted in evidence at trial (hereafter "the
Attachment") is appended to this Memorandum.  This is a drawing that, as the Court
understands it, purports to approximate the location of various property boundaries and
lot configurations, and the location on the various parcels of some of the houses and
improvements discussed herein.  It was offered at trial, and is attached to this decision,
for illustrative purposes only.  By attaching it to this decision, and by reference to this
diagram, the Court does not necessarily find it to be a precise depiction of the properties,
boundaries or improvements, but finds it helpful for illustrative purposes.

MEMORANDUM OF DECISION - 3

represented by Mr. Harrison and that its title was unmarketable.  What follows is a
more comprehensive discussion of how the events unfolded resulting in Plaintiff's
problem, and the consequences of those events.

### Defendants Purchase the Land.

Mr. Harrison, a general contractor, was in the business of moving
homes onto property, improving them, and selling the house and properties to
others.  While Ms. Harrison (formerly Julie Rawls) occasionally assisted her
husband with business matters, the testimony and evidence established that Mr.
Harrison primarily conducted the business.  Ms. Harrison's involvement in the
business appeared limited to paying bills and signing the required documentation
for the land sale transactions.

In 1994, prior to the Harrisons' marriage, Mr. Harrison purchased
several lots, including Lots 28 and 29, in the Ora Dell subdivision located off
Petrie Street in Boise, for development purposes.  Because of Mr. Harrison's poor
credit history, he purchased the property in the name of his mother, Betty
Harrison.  For reasons that remain unclear to the Court, in 1996, title to atleast
portions of Lots 28 and 29 were transferred to Julie Rawls by Warranty Deed from
Betty Harrison.  *See* Exs. K–M.  It is clear, however, that Mr. Harrison was in
control of these properties.

MEMORANDUM OF DECISION - 4

Mr. and Ms. Harrison both explained that they would always purchase property in their individual names, and not as husband and wife. In whose name the property was titled depended upon which one of them had a better credit rating at the time, thereby improving their ability to use the land to obtain credit. And sometimes, as was the case with the Petrie property, the property was titled in Betty Harrison's name.[3]

### Mr. Harrison Solely Directed the Development of the Property.

6912 Petrie Street, the home and lot Plaintiff purchased, is located on Lot 28, a rectangular lot with Petrie Street located to its south and Lot 29 to its west. It seems that after acquiring Lot 28, Mr. Harrison effectuated a "lot split" resulting in the creation of two lots suitable for houses instead of one. As shown on the Attachment as "Parcel C," the south, or front lot, is a fairly narrow rectangular parcel. While not shown on the Attachment, an irrigation ditch runs through roughly the center of the property, diagonally from southeast to northwest. The second lot created by the split (shown as "Parcel B" on the Attachment) is what is known as a "flag lot," consisting of a large rectangular

---

[3] Betty Harrison was unable to appear before the Court as a witness for health reasons. Therefore, the parties stipulated to present her testimony by way of deposition. *See* Ex. 50. Interestingly, from her deposition testimony, it appeared she was unaware as to what property she had purchased for her son. Instead, she just signed what Mr. Harrison asked her to sign, or allowed him to sign documents for her. *See* Deposition of Betty E. Harrison, pp. 6–11, Ex. 50.

MEMORANDUM OF DECISION - 5

parcel to the north connected by the "pole" portion of the property to Petrie Street, thereby providing street access to the lot. This pole portion was designed by Mr. Harrison to be 30 feet wide to comply with the City of Boise's minimum requirement for street frontage. Defendants also owned two other properties, 6819 Poplar (shown on the Attachment as "the Garage" parcel) and 6821 Poplar ("Parcel A"), located to the north of Lot 28.

Mr. Harrison intended to place three homes on the now divided Lot 28. First, Mr. Harrison built a house now known as 6900 Petrie Street, in which he and his wife were to reside. Because of the location of the ditch, Mr. Harrison placed the house in a location that encroached onto the pole portion of 6912 Petrie. He also built a guest house, known as 6904 Petrie, on the same parcel, Parcel C, in which Betty Harrison resided. The home that became 6912 Petrie was to be moved onto the property from another location.

Mr. Harrison's development efforts proceeded as follows. He began by splitting Lot 28 as discussed above. To do so, he completed and filed a "Lot Split Check List" with Boise's Public Works Department, Ex. 24, as well as a Lot Dimension Worksheet, Ex. 23. Mike Hall, who worked in the Boise Planning Department, signed off on the Checklist. *See* Ex. 24.

MEMORANDUM OF DECISION - 6

Thereafter, on June 3, 1996, the City of Boise issued a permit allowing Defendant to pour a foundation at 6912 Petrie so that a house could be moved onto that property.  Ex. 28.  Defendant personally directed where the foundation was to be located for the home he planned to move onto 6912 Petrie.

On June 27, 1996, the City of Boise issued building permits for the construction of the house and guest house at 6900 and 6904 Petrie, respectively, where Defendants and Betty Harrison would eventually reside.  Exs. 27 and 26. The plans submitted to the City for these houses did not show the ditch on the 6900 Petrie property, or that because of the ditch, the placement of Defendants' home at 6900 Petrie would encroach upon the pole portion of 6912 Petrie. Throughout the building process, the City inspected the construction of the house and approved it.[4]  *See* Exs. 26–28 and Ex. J.  Mr. Harrison concedes he never

---

[4] David Abo, the City of Boise's chief subdivision compliance officer, testified that he is unsure of how the various problems with Lot 28 could have arisen, or why issues regarding location of the improvements on the lot weren't discovered by the City earlier, presumably at or before the time Mr. Harrison was engaged in his development projects and the initial building permits were issued.  Mr. Abo was not able to locate all the documents about Defendants' house projects in the City's records, such as the permit for construction of the common driveway.  He speculates many of the required documents were never completed.   He testified that, based upon his long experience, the City does not issue permits for projects that violate City codes, and had they realized the problem, City inspectors would not have allowed 6900 Petrie to be placed where it is due to its  encroachment on 6912 Petrie.  Mr. Abo's opinion is that all these problems arose in the field because, had they appeared on the site plan submitted by Mr. Harrison, the permits would not have been issued due to non-compliance with applicable zoning regulations.  His conclusion is that Mr. Harrison did not provide accurate information regarding the property when submitting site plans and obtaining permits.

MEMORANDUM OF DECISION - 7

competed the necessary forms for construction of the shared driveway ostensibly to be located between Lots 28 and 29 to provide access to all the homes from the street.  In spite of lack of approval, he constructed the driveway anyway.  While Mr. Harrison testified he believed it possible to obtain the necessary permit after pouring the driveway, City records do not show that Mr. Harrison ever attempted to later obtain the permit.

Mr. Harrison had previous experience with this type of development project.  Mr. Harrison testified that he had effectuated two or three lot splits prior to his development of Lot 28.  Additionally, he had experience with identifying lot lines in conjunction with his construction work for a building contractor, Capital Building.

### Mr. Harrison Orders a Survey of the Property.

As part of the development of the Lots, in 1996, around the same time he obtained building permits, Mr. Harrison hired land surveyor Colleen Marks to perform a survey.  In discussing the project with Ms. Marks, he identified several goals.  Mr. Harrison told Ms. Marks he hoped to adjust the north-south lot line between Lots 28 and 29 so it fell down the center of the existing common driveway.  He also wanted to combine 6819 Poplar, the shop property, with 6912 Petrie, by deleting the existing property line between them,

MEMORANDUM OF DECISION - 8

thereby creating a single parcel containing both the house and shop.  Finally, he

hoped to adjust the property lines of 6821 Poplar, the property Defendants owned

located to the north of the shop at 6819 Poplar.  Defendant also asked Ms. Marks

to draft new legal descriptions for the various parcels reflecting these changes to

the boundaries of the properties.

        Ms. Marks was a highly credible witness at trial, and the Court has

placed substantial weight upon her cogent testimony.  She testified about her work

and conversations with Mr. Harrison regarding the adjustment of the boundary

line between Lots 28 and 29.  She stated that, after having retained her, and after

she had made and discussed with Mr. Harrison several attempted line adjustments,

Mr. Harrison told her the City of Boise would not allow him to move the lot line

separating Lots 28 and 29 as much as he wanted, and so she should just leave the

line where it was.[5]  But by failing to move the lot line, Ms. Marks testified it was

clear that the common driveway would be located entirely within Lot 29.

        Ms. Marks finished the survey report, signing it on September 19,

1996.  She then presented it to Mr. Harrison.  Ex. 14.  Because Mr. Harrison had

instructed Ms. Marks not to adjust the lot line between Lots 28 and 29 after she

---

[5]  Mr. Abo, Boise City's chief subdivision reviewer, suggested if the lot line was
moved as much as Mr. Harrison desired, it could cause the parcels on Lot 29 to violate
city code, which requires that each lot have at least 30 feet of street frontage.

MEMORANDUM OF DECISION - 9

had attempted to do so several times, the survey was limited to eliminating the

property line between 6819 Poplar, the shop property, and 6912 Petrie, the flag lot

to the south, and adjusting property lines for 6821 Poplar, the lot with the house

located north of the shop.  On October 8, 1996, Ms. Marks sent Defendants an

invoice for her services describing the work she had performed.  Ex. 15.  That

invoice described her services in attempting to adjust the north-south boundary of

Lots 28 and 29, but indicated she had been told to leave the lot line as is.  Ms.

Marks also sent an undated note to Mr. Harrison, presumably with the survey she

completed, which read:

> Mike,
> You need to sign the back page [and] have the signatures
> notarized then return to me so I can file it w/ the city – Need
> cashiers ck [sic] for $105
> Thanks
> Colleen Marks

Ex. 16.  Ms. Marks never received the signed survey back from Mr. Harrison, nor

did Mr. Harrison record the survey himself.

Ms. Marks' business practice is to assemble a packet for her clients

to submit to Boise City Planning and Zoning to obtain its approval of the changes

made in the survey.  Once Planning and Zoning signed off on the project, the

survey could then be recorded and the boundary line changes formalized.  Ms.

Marks testified that state law requires her, as a licensed surveyor, to record a

MEMORANDUM OF DECISION - 10

survey within 90 days of completion of the project if she sets any survey pins during that process, as she had done to complete Defendants' project. Because of this requirement, Ms. Marks continued her attempts to contact Defendants regarding the status of the project to see if it had been completed and the survey recorded. Mr. Harrison testified that he did not see Ms. Marks' note until he recently looked at the survey again. Additionally, Mr. Harrison does not recall receiving any phone calls from Ms. Marks about recording the survey. All things considered, however, the Court has no doubt that Ms. Marks made multiple phone calls to Mr. Harrison.

In October 2001, Ms. Marks noticed a "sold" sign at 6821 Poplar, property she had surveyed for Defendants. She investigated the county records and discovered the legal description used in the conveyance documents matched the revised legal description she had written for Defendants. Since she concluded people had been led to rely upon her work, and in light of her professional obligations, on October 26, 2001, Ms. Marks recorded her survey report. According to Ms. Marks, she took this extraordinary step to protect herself under Idaho law, and so that the public records would accurately reflect the location of the pins she had set as part of the survey. But because Defendants had not completed the City's approval process when Ms. Marks recorded her survey, the

MEMORANDUM OF DECISION - 11

changes described in the survey did not effectively or officially change the actual

boundary lines.  Again, based upon Ms. Marks' conversations and

communications with Mr. Harrison, she was confident that Mr. Harrison was

indeed aware of the process he needed to undertake to obtain approval from local

officials for the boundary changes.

   Mr. Harrison testified he did not sign and submit the survey to the

City because he was not satisfied with it, primarily because of its failure to adjust

the lot line between Lots 28 and 29 to correct the location of the driveway.

However, he acknowledged this "problem" resulted from his directions to Ms.

Marks to leave the boundary as is.  But the survey also clearly showed that the

house Defendants were constructing at 6900 Petrie encroached onto the pole

portion of the flag lot at 6912 Petrie.  Mr. Harrison provided no explanation as to

how moving the boundary line between Lots 28 and 29 would resolve this

encroachment problem.  To eliminate the encroachment, an adjustment to the lot

line between 6900 and 6912 Petrie would have been required.[6]  After receiving the

---

[6] Of course, moving this lot line was also problematic.  As noted above, to be
"legal," each resulting parcel must have a  minimum of 30 feet of street frontage.  The
boundary of the smaller rectangular lot, Parcel C, on Lot 28 could not be relocated so as
to widen the parcel because to do so would have left the pole portion of the flag lot with
less than the 30 feet minimum frontage.   And with the ditch running through Lot 28, the
rectangular lot, Parcel C,  was not configured to allow for construction of both the house
and the guest house.  As a result, assuming the configurations are as shown in Exhibit 14,
Defendants' intended plans for developing these lots did not appear feasible given the

MEMORANDUM OF DECISION - 12

survey from Ms. Marks, Defendants took no further action to formally adjust the

lot lines.

### Defendants Sell 6912 Petrie to Plaintiff.

Defendants moved a house onto the 6912 Petrie property in the

spring of 1996.  They rented that house and property to others until Plaintiff

purchased it in September 1999.  The Residential Purchase Agreement and

Deposit Receipt, Ex. 2, dated September 2, 1999, indicates Plaintiff agreed to

purchase the home for $139,000.  Plaintiff and Mr. Harrison both acknowledged

that Plaintiff did not actually sign this Purchase Agreement.  With his permission,

Mr. Harrison signed for Plaintiff.  Mr. Harrison also added a handwritten

additional term and condition to the Purchase Agreement that the property was

being sold to Plaintiff "as is where is without any warranties expressed or

implied."  Plaintiff was not aware of this condition when he authorized Mr.

Harrison to sign his name to the document.

Of course, before the parties agreed to the terms of sale and prior to

the closing, Mr. Harrison had shown the property to Plaintiff.  It was at that time

that Mr. Harrison told Plaintiff that the flag lot Plaintiff was buying included half

of the driveway, and also the shop located directly behind the house (i.e., 6819

---

dimensions of Lots 28 and 29.

MEMORANDUM OF DECISION - 13

Poplar).  Mr. Harrison made these representations to Plaintiff even though Mr.

Harrison was clearly aware at the time of the unresolved lot line issues discussed

above.  Since Mr. Harrison was his friend and the property's developer, Plaintiff

believed the property he was purchasing was as represented; that is, that the

property included the driveway and shop, and that there were no encroachments.

As part of the sale process, Roger Jennings, a real estate appraiser,

valued the property for Plaintiff's lender, Hopkins Financial.  He testified that the

appraised value he calculated assumed the property lines were located as he was

told on September 8, 1999.  Mr. Jennings testified he could not remember who,

but someone met him at the property and showed him the property boundary lines

on that date.  The Court has no reason to believe that the appraiser would have met

anyone other than Mr. Harrison to show him around the property.  Mr. Jennings

appraised the land, house and shop as all located on one lot to be worth $129,000.

Ex. 18.   Based upon the appraisal, Plaintiff and Mr. Harrison agreed to adjust the

purchase price to $130,000.   Mr. Jennings also testified that the property would

have been worth significantly less (although he did not offer a precise opinion)

given the boundary line and encroachment issues.

At closing on September 28, 1999, Defendants gave Plaintiff credit

for an $8,000 cash down payment he had previously paid to Mr. Harrison toward

MEMORANDUM OF DECISION - 14

the purchase of the Frye Street house.  Plaintiff borrowed $105,500 from Hopkins

Financial, Ex. X, a loan he obtained with the assistance of Mr. Harrison.  He also

signed a promissory note secured by a second deed of trust on the property,

payable to Julie Rawls, for  $16,700, Ex. 3.[7]

        Plaintiff became concerned at the closing when, for the first time, he

discovered the "as-is" provision that Mr. Harrison had added to the Purchase

Agreement.  He also first learned at that time that Betty Harrison, not Mr.

Harrison, held title to the property.[8]  Though this concerned him, because of all the

help Mr. Harrison provided with finding and financing the home for him,  Plaintiff

completed the transaction.

---

[7] The note amount was calculated to also include sums Plaintiff owed Ms.
Harrison for utilities she had paid on his behalf while a tenant at the Frye Street house.
*See* Ex. U.  Defendants also claim Plaintiff owed them money for a trip he took to
McCall, Idaho, and for back rent.  Defendants' accounting of these sums reflects that
Defendants owed Plaintiff certain sums, too, for work he had performed and for some
items they had purchased from him.  While Plaintiff agrees with Defendants that the
parties kept a running balance of the money each owed, he contends it was agreed that
the debts he owed Defendants would be forgiven if he purchased a home from them.  All
told, however, the amount of other debt owed to Defendants was only $1,372.85, Ex. U,
so it appears the bulk of the $16,700 note given to Ms. Harrison was for the purchase of
the property.

[8] Betty Harrison granted a Special Power of Attorney to Mr. Harrison to act on
her behalf in selling 6912 Petrie Street. Ex. 36.  Mr. Harrison signed the Warranty Deed
on behalf of his mother.  Ex. 37.  Additionally, Mr. Harrison and Betty Harrison testified
that Betty Harrison received no money from the property sale and Mr. Harrison was to
keep all the money.

MEMORANDUM OF DECISION - 15

In a conversation immediately after closing, Mr. Harrison told Plaintiff that he had noticed the legal description in the deed he had signed to transfer the property to Plaintiff did not include the shop property at 6819 Poplar. Mr. Harrison assured Plaintiff that he considered this a minor problem and believed it could be easily remedied by Mr. Harrison simply deeding the property to Plaintiff. This explanation satisfied Plaintiff. But Mr. Harrison's subsequent actions belie his concern for Plaintiff. Mr. Harrison never did deed this property to Plaintiff. As his excuse for not carrying through on his promise to Plaintiff, Mr. Harrison explained he was unsure how it would impact the mortgage held by Hopkins Financial, and he became concerned that if he deeded the property to Plaintiff, Hopkins Financial would sue him. He never offered this explanation to Plaintiff.

After closing, Plaintiff moved into the house and began making improvements. Among the other projects he completed on the property, Plaintiff installed a kitchenette with laundry hook-ups; added a second furnace; remodeled a bathroom; and installed an irrigation system to water the front and back yards. Plaintiff added a wood stove and a sliding glass door in the shop. *See* Ex. 5. Plaintiff claims that as of September 12, 2002, he had spent over $16,000 on the

MEMORANDUM OF DECISION - 16

various improvements to 6912 Petrie and the shop property.  However, this figure

includes the cost of his labor, which he values at $8,543.60.  *See* Ex. 4.

### Foreclosure on Lot 29.

During 1995 and 1996, Defendants had also moved houses onto Lot

29.  These houses are known as 6916 and 6916A Petrie Street.  Defendants rented

these houses.  Ms. Harrison testified that the amount of the rent Defendants

received was insufficient to cover the mortgage payments and maintenance on the

property.  As a result, Defendants defaulted on the mortgages and lost the property

through foreclosure.  However, on February 23, 2000, immediately prior to the

foreclosure sale,  Ms. Harrison, as the record owner of Lot 29, executed an

easement in favor of  Plaintiff for his use of the driveway.  Ex. 38.  Ms. Harrison

testified while she saw no need for the easement because the driveway was big

enough for two vehicles to pass at the same time, she signed the easement because

Mr. Harrison felt she should do so.  It appears Plaintiff was unaware of the

easement at the time it was granted.[9]

### Defendants Transfer Plaintiff's Promissory Note.

---

[9]  It is also unclear to the Court whether that easement continues in effect in
light of the subsequent foreclosure.

MEMORANDUM OF DECISION - 17

In May 2000, not long after losing the Lot 29 properties in foreclosure, Ms. Harrison transferred the $16,700 note Plaintiff had given her to Kim Kildew. Ex. 19. She did this because Mr. Kildew owned property in Eagle, Idaho, that Mr. Harrison hoped to purchase, and the note was offered to and accepted by Mr. Kildew for partial payment under the parties' sale agreement.

Because the note was secured by Plaintiff's property, before accepting it, Mr. Kildew visited 6912 Petrie with Mr. Harrison. At that time, Defendant showed Mr. Kildew the property and described the location of the property lines to him. Mr. Harrison told Mr. Kildew the boundary lines were located in the same places as he indicated to Plaintiff. Defendant failed to inform Mr. Kildew that title to the shop property had not been transferred to Plaintiff when he purchased 6912 Petrie, or that Defendant still held title. Defendant also failed to inform Mr. Kildew of any problems associated with the location of the common driveway or that the house at 6900 Petrie encroached onto the pole portion of the property. Because Plaintiff had a good payment history, Mr. Kildew agreed to sell the Eagle Property to Mr. Harrison and accept the note, giving Mr. Harrison full value for the amount due on the note.[10]

### Plaintiff Discovers the Problems with the Property Lines.

---

[10] Although the promissory note was payable to Ms. Harrison, Mr. Harrison testified title to the property purchased from Mr. Kildew was placed solely in his name.

MEMORANDUM OF DECISION - 18

Shortly thereafter, during the summer of 2000, Plaintiff became aware that there were problems with the lot lines.

Plaintiff returned home from work one day to find that the new owner of the houses on Lot 29 had apparently commissioned a survey. Plaintiff realized the stakes placed as part of that survey marking out the boundaries for Lot 29 were not where Plaintiff believed they should be based upon Mr. Harrison's representations to him. Working off the stakes, Plaintiff performed measurements and drew a diagram of where the property lines should be on a plat map. *See* Ex. 6. Plaintiff testified Mr. Harrison saw him measuring in Mr. Harrison's front yard, but Mr. Harrison never approached him to ask what he was doing. Realizing his predicament, Plaintiff became very angry at Mr. Harrison. He never thereafter confronted Mr. Harrison about the property line problems. He was convinced Mr. Harrison had always known about these defects, and had lied to him to get him to purchase the property.

After learning the location of the actual property lines, Plaintiff realized Mr. Harrison had misrepresented the location of the property lines. He also discovered that the house Mr. Harrison had built on 6900 Petrie encroached substantially onto the pole portion of his property as the pole was not located where Mr. Harrison had indicated. He then realized the lot line between Lots 28

MEMORANDUM OF DECISION - 19

and 29 did not run down the center of the driveway as Mr. Harrison had

represented, but that the driveway that provided his only street access was located

entirely on Lot 29.  And because Defendants had failed to record the survey, the

lot line between 6819 Poplar and 6912 Petrie was never removed.  This failure

meant that Plaintiff's home at 6912 Petrie likely failed to meet the minimum

setback requirements of the Boise City Code.

### Defendants Sell Their Remaining Property in the Development.

Not long after seeing the stakes for the survey on Lot 29, Defendants

sold the home they were living in on Lot 28.  In November 2000, Renn Gebhardt

bought the house at 6900 Petrie as well as the guest house at 6904 Petrie (i.e., all

of Parcel "C" on the Attachment).  In the Seller's Disclosure, required by Idaho

Code §§ 55-2501 *et seq.*, the question which asks "Are there any conditions that

may affect your ability to clear title such as encroachments, easements, zoning

violations, lot line disputes, restrictive covenants, etc.?" was answered "no."  Ex.

21.  While it purports to bear the signatures of both Mr. Harrison and Mr.

Gebhardt, Defendant denies he signed the disclosure form.  Mr. Harrison claims

that while he discussed the document with his realtor over the phone, the realtor

must have signed his name to it.  Additionally, this document falsely indicates the

property has not been surveyed since Defendants had owned it. Ex. 21.  Even if

MEMORANDUM OF DECISION - 20

the realtor signed the disclosure, it is clear to the Court that Mr. Harrison provided the information reflected in the disclosure statement, and that information was false.

### Plaintiff Loses His Property.

In January 2001, knowing the title to his property was terribly flawed, Plaintiff lost heart and stopped paying on the promissory note now held by Mr. Kildew.  Plaintiff testified that he hoped when Mr. Kildew did not receive payments, he would be motivated to help Plaintiff to clear up the title problems, and possibly have some sway over Defendants.  Mr. Kildew sent a Notice of Default to Plaintiff in early November 2001.  Ex. HH.  However, upon advice of counsel, and presumably because of the title problems, Mr. Kildew decided not to proceed with the foreclosure on the property.  Instead, Mr. Kildew sued Plaintiff in state court.  As a result of an agreement of the parties, Mr. Kildew obtained a money judgment against him for $33,738.79 on April 22, 2004.  Ex. 8.[11]

As there appeared to be no solution for him to resolve the problems with the property lines without Defendants' help,  Plaintiff believed he was throwing good money after bad, and in November 2001, he also ceased payments

---

[11]  Mr. Kildew promises in the agreement he would not seek to enforce the judgment until six months after Plaintiff resolved this adversary proceeding against Defendants. Ex. 7.

MEMORANDUM OF DECISION - 21

to Hopkins Financial.  On December 30, 2003, Hopkins Financial sold its note and

deed of trust to Renn Gebhardt, the new owner of 6900 and 6904 Petrie.  Ex. MM.

Gebhardt then foreclosed, purchased 6912 Petrie at the foreclosure sale, and

became the owner of all of Lot 28.  He also acquired title to the shop property at

6819 Poplar through a settlement agreement entered into with Defendants.[12]

Plaintiff currently rents 6912 Petrie from Mr. Gebhardt for $750.00 per

month.

### Mr. Harrison Was Always Aware of the Boundary Problems.

Mr. Harrison insists he did not know about the problems with the

property lines until 2001 when he received a phone call from a person with whom

he used to work.  He testified that, at that time, he spoke with employees at

Transnation Title about whether the issues with the boundary lines were

significant or impaired the marketability of the various parcels.  Mr. Harrison

_____

[12]  Mr. Gebhardt testified he originally attempted to sell the 6900/guest house lot,
but was unable to do so due to the encroachment.  He saw his acquisition of the Hopkins
note and mortgage on 6912 Petrie and the 6819 Poplar properties as steps toward
resolving the various properly line issues.  Mr. Gebhardt testified he must next obtain an
easement for the driveway on Lot 29.  He thinks this can be accomplished because the
owner of Lot 29 needs an easement from Mr. Gebhardt for a required fire truck turn-
around.  But even after acquiring the driveway easement, Mr. Gebhardt must navigate the
City's planned unit development process to obtain necessary city code variances to truly
make the properties marketable.

MEMORANDUM OF DECISION - 22

stated he had several conversations with Transnation Title and then never followed up on the matter.

Mr. Harrison's testimony is not credible.  The Court is persuaded and finds that Mr. Harrison was keenly aware of the true location of the various lot lines, and appreciated the implications thereof, long before 2001.  As his own testimony established, he had experience as a building contractor in finding lot lines.  He acknowledged in other testimony that he knew in 1996 that the house he was building at 6900 Petrie encroached onto the pole portion of the 6912 Petrie lot; he added the "as-is" language to the Plaintiff's purchase agreement; he believed it was necessary in 2000 that his wife grant an easement to Plaintiff for use of the driveway before losing Lot 29 in foreclosure; he hired Ms. Marks to conduct a survey to adjust the various lot lines, and that he then failed to submit that survey to the City or record it; and he later saw Plaintiff measuring stakes located inconsistent with Mr. Harrison's representations as to the location of the lot lines.

Mr. Harrison testified that he believed Colleen Marks had recorded the survey and that his understanding was that the survey had remedied both the encroachment and had removed the property line between 6912 Petrie and 6819 Poplar.  This explanation makes very little sense in light of his other testimony,

MEMORANDUM OF DECISION - 23

wherein he stated that because the survey Ms. Marks performed in 1996 did not

correct the problems, he did not record it.  In addition, Defendants paid Ms.

Marks' invoice for her services, an invoice with a notation that, per his

instructions, she had not moved the line between Lots 28 and 29.  *See* Ex. 15.

Clearly,  Mr. Harrison was aware that the lot line problems existed (and thus the

need for a survey) and of the need to submit the survey to the City for approval

and to record it to make it legally effective.  The Court believes Ms. Marks'

testimony that she made it clear to Mr. Harrison what he needed to do with the

survey to make the various changes legal.  Ms. Marks could not complete the

process without Mr. Harrison's cooperation and signature on the survey.  Contrary

to his version of the facts, the Court finds Mr. Harrison deliberately chose to not

complete the survey-lot line adjustment process.  Instead, even realizing the

potential for problems, Defendant proceeded to build and move houses on the

property, then sold the homes concealing the problems from the purchasers.

### Plaintiff's Damages.

Plaintiff alleges he has been damaged as a result of Defendants'

conduct.  He seeks a nondischargeable money judgment against Defendants in the

amount of $61,893.68.

MEMORANDUM OF DECISION - 24

Plaintiff offered evidence of the damages he had suffered through September 12, 2002. Ex. 4. Plaintiff claims Defendants should be responsible for the $8,000 down payment he paid to Defendants as part of the purchase transaction; the $33,738.79 judgment Mr. Kildew now holds against Plaintiff based upon the note he signed; the $16,754.89 in improvements Plaintiff made to the property; $900 Mr. Harrison obtained on behalf of Betty Harrison via garnishment of Plaintiff's wages under a small claims judgment; and $2,500 representing the appraised value of the shop. *See* Exs. 1, 3, 4 and 8.

**This Action and the Parties' Arguments**.

Defendants filed for relief under chapter 7 on July 30, 2004. Plaintiff timely instituted this adversary proceeding on October 20, 2004.

In this action, Plaintiff contends he should be awarded damages against Defendants, and that the award should be excepted from discharge under § 523(a)(2)(A) because Defendants defrauded him in connection with his purchase of 6912 Petrie Street. In addition, he alleges Defendants willfully and maliciously failed to deed the shop property to him, which caused set-back problems regarding the house. He argues that his resulting damages should also be excepted from discharge under § 523(a)(6).

MEMORANDUM OF DECISION - 25

Defendants contend they did not know about the lot line problems when the property was sold to Plaintiff, and that they had no subjective intent to wilfully injure Plaintiff in failing to deed him the shop. Additionally, Defendants argue any damages Plaintiff suffered were not proximately caused by Defendants' alleged fraud, but were incurred as a result of Plaintiff's failure to pay the mortgage payments. Finally, Defendants contend any damages awarded to Plaintiff should be reduced by the benefit Plaintiff received while he resided on the property while not making mortgage payments.

### Conclusions of Law and Analysis

### A. Plaintiffs' § 523(a)(2)(A) Claim.

To except a debt from discharge under § 523(a)(2)(A), Plaintiff must prove by a preponderance of the evidence that "(1) [Defendants] made representations; (2) which at the time [Defendants] knew were false; (3) [Defendants] made the representations with the intention of deceiving Plaintiff; (4) Plaintiff relied on such representations; and (5) Plaintiff sustained the alleged loss as the proximate result of the representations." *Bell, et al. v. Smith* (*In re Smith*), 98.4 I.B.C.R. 119, 120 (Bankr. D. Idaho 1998) (citing *American Express v. Hashemi* (*In re Hashemi*), 104 F.3d 1122, 1125 (9th Cir. 1996)). "Intent to deceive is a question of fact which may be inferred from the surrounding circumstances of

MEMORANDUM OF DECISION - 26

the case." *Farmers & Merchants State Bank v. Cracchiolo* (*In re Cracchiolo*),

00.2 I.B.C.R. 84, 86 (Bankr. D. Idaho 2000) (citing *Cowen v. Kennedy* (*In re*

*Kennedy*), 108 F.3d 1015, 1018 (9th Cir. 1997)).

   For a debt to be excepted for fraud, the creditor's reliance upon the

false statement need only be justified; reasonable reliance is not required.  *Field v.*

*Mans*, 516 U.S. 59, 74–75 (1995); *see also Bell, et al. v. Smith* (*In re Smith*), 98.4

I.B.C.R. 119, 121–22 (Bankr. D. Idaho 1998).  "Justification is a matter of the

qualities and characteristics of the particular plaintiff, and the circumstances of the

particular case, rather than of the application of a community standard of conduct

to all cases."  *Field*, 516 U.S. at 71.  However, significantly, "a person . . . cannot

recover if he blindly relies upon a misrepresentation the falsity of which would be

patent to him if he had utilized his opportunity to make a cursory examination or

investigation."  *Id.*  Proximate cause

   is sometimes said to depend on whether the conduct
   has been so significant and important a cause that the
   defendant should be legally responsible.  But both
   significance and importance turn upon conclusions in
   terms of legal policy, so that they depend on whether
   the policy of the law will extend the responsibility for
   the conduct to the consequences which have in fact
   occurred.

MEMORANDUM OF DECISION - 27

*Britton v. Price* (*In re Britton*), 950 F.2d 602, 604 (9th Cir. 1991) (quoting W.

Page Keeton et al., *Prosser and Keeton on The Law of Torts* § 42 at 273 (5th ed.

1984)).

> **1.      Defendant Michael Harrison falsely represented the
> location of the property lines intending to deceive
> Plaintiff.**

Defendant Michael Harrison made false statements to Plaintiff in

connection with the sale of the 6912 Petrie property.  Defendant told Plaintiff that

half of the driveway and the shop were part of the property Plaintiff was

purchasing.  At the time Defendant made these statements in 1999 he knew they

were false.  Defendant had hired a surveyor to adjust the lots lines, but he had

never recorded the 1996 land survey.  He understood that in order to make the

boundary changes legally effective, he would have to submit them to authorities

and record the survey.  He received repeated contacts from Ms. Marks to find out

the status of the project.  Knowing the true location of the lines, Defendant

directed the placement of the house on the 6912 Petrie lot, and he built the home at

6900 Petrie such that it encroached on to 6912 Petrie.  There is no doubt

Defendant knew these actions would render title to the properties unmarketable.

In connection with the sale transaction with Plaintiff, Defendant

wrote an additional waiver of any warranties into the Residential Purchase

MEMORANDUM OF DECISION - 28

Agreement in an attempt to avoid claims by Plaintiff he knew were likely to arise. And in 2000, he decided an easement for the driveway must be obtained because he knew no part of the driveway was located on Lot 28. Defendant Mr. Harrison knowingly developed the property without regard to the required codes and procedures. For all these reasons, the Court finds that when he gave Plaintiff incorrect information about the location of the property boundaries in 1999, he knew those representations were false.

Prior to Mr. Harrison's representations, Plaintiff was in the process of securing financing to purchase the Frye Street house and had already paid $8,000 to Defendants as down payment. Mr. Harrison's false representations about the Petrie property lot lines were made so that Plaintiff would purchase that property. Had Mr. Harrison not lied as he did, he would have been unable to sell the property, which was clearly his goal. The Court concludes the false statements made by Mr. Harrison to Plaintiff regarding the Petrie property were made with the intent to deceive Plaintiff into believing the property lines were favorable so Plaintiff would purchase the property.

### 2. Plaintiff's reliance was justified.

Plaintiff was justified in his reliance on Mr. Harrison's representations as to the location of the property lines. Plaintiff and Mr. Harrison

MEMORANDUM OF DECISION - 29

were good friends.  There was nothing about the physical appearance of the

property or location of the improvements that would have caused Plaintiff to doubt

the truth of what Mr. Harrison had told him about the location of the property

boundaries.  And nothing occurred prior to the closing that would have led

Plaintiff to believe the property lines were other than as represented.

   The property was appraised for Plaintiff's lender based upon the

erroneous boundaries Mr. Harrison had given to the appraiser, and a title insurance

policy was issued.  The only practical manner in which Plaintiff could have

discovered Mr. Harrison's deceit was by his personal review of the recorded plats,

something no one, including Mr. Harrison, would expect Plaintiff to do.  The legal

descriptions and the property's physical appearance comported with Mr.

Harrison's representations.  Plaintiff had no reason to question the boundaries Mr.

Harrison, the property's developer, showed him.

   **3.**  **Defendant also committed fraud misrepresenting the
location of, and in later failing to transfer, the shop
property to Plaintiff.**

   Mr. Harrison assured Plaintiff that the small shop located adjacent to

the house at 6912 Petrie was included in the property Plaintiff was purchasing.

When title to the shop property did not pass to Plaintiff at closing, Defendant

assured Plaintiff he would resolve the issue by deeding him the shop property.

MEMORANDUM OF DECISION - 30

This statement was false.  Had Defendant intended to transfer the shop property to Plaintiff, he easily could have done so, since he was experienced and familiar with transferring property.  The Court simply does not believe Mr. Harrison's explanation that he failed to have the shop property deeded to Plaintiff for fear of litigation with Hopkins Financial.

The results of the land survey performed by Ms. Marks had confirmed to Defendant that the shop was located on a separate parcel from the house at 6912 Petrie.  Mr. Harrison intended to deceive Plaintiff into believing he would fix the problem when in actuality he was unwilling to transfer the property.  Plaintiff was justified in his reliance on Mr. Harrison's statement that Plaintiff would promptly receive title to the shop property as it was clearly part of the parties' sale agreement.

### 4.    Plaintiff's damages were proximately caused by Mr. Harrison's fraudulent statements.

Plaintiff is entitled to recover damages as a result of Mr. Harrison's fraud if he shows by a preponderance of the evidence that those damages were proximately caused by Defendant's conduct.  For the most part, Plaintiff has done so.

Plaintiff agreed to purchase the property based upon Mr. Harrison's fraudulent statements.  Because the terms of sale were fraudulent, Plaintiff is

MEMORANDUM OF DECISION - 31

entitled to recover the expenditures he made in connection with the transaction.

It goes without saying that Plaintiff is entitled to a return of the $8,000 cash payment he used to purchase the property.  Had he not been defrauded, he would not have paid this sum to Mr. Harrison for this property.

In addition, Plaintiff signed and gave Ms. Harrison a $16,700 promissory note as part of the purchase price.  Ms. Harrison thereafter transferred the note to Mr. Kildew.  Had she not done so, the Court would be in a position to relieve Plaintiff from any further obligation under the note.  But as a result of Mr. Harrison's fraud in inducing Plaintiff to sign the note, and Ms. Harrison's subsequent transfer of that promissory note to Kildew, Mr. Harrison caused Plaintiff to become indebted to Mr. Kildew for $33,738.79 under the state court judgment.  Ex. 8.  It is of no significance that Plaintiff failed to make the payments on the note, or that he incurred additional obligations for interest, attorney fees and costs under that note.  Plaintiff, in good faith, felt justified in suspending payments on an obligation when his purpose for executing that note, acquisition of a house with a marketable title, was unattainable.  Whether Plaintiff acted reasonably or not in interrupting payments, Defendant is in no position to complain.  Defendant must compensate Plaintiff for his loss.  As a result, the

MEMORANDUM OF DECISION - 32

Court concludes all the money owed to Mr. Kildew is a direct consequence of

Defendant's fraudulent actions.

        Plaintiff is also entitled to recover from Defendant the expenditures

he made to improve the house and shop.  Specifically, Plaintiff adequately proved

he spent $8,211.29 to purchase goods and materials for improvements.  Plaintiff

may also recover amounts he paid to others to improve the property: $3,500 paid

to Think Green to install the sprinkler system; $623.60 paid to Concrete Creations

for concrete installation; and $520 paid to Pipeman Inc. to rough in the kitchen

and laundry plumbing.  *See* Ex. 4.  However, the Court will not allow Plaintiff to

recover the value of his own labor.  While Plaintiff is a tradesman and his services

are certainly valuable, in making the improvements he acted in his role as the

owner of the property, and any benefit from his labors would be reflected in the

increased value of the property, even though Plaintiff never realized that value.

Therefore, for improvements, Plaintiff is entitled to $12,854.89 from Defendant.

        Plaintiff requests only $2,500 for loss of the shop property.  This

appears to be based upon the value opinion of the appraiser Roger Jennings, who

testified the shop contributed $2,500 to the overall value of the house/shop

property.   Plaintiff may also recover this modest amount for the value of the shop

property from Defendant.

MEMORANDUM OF DECISION - 33

Plaintiff failed to offer proof as to the nature of the $900 garnished from his account to pay Betty Harrison.  The Court speculates that this garnishment occurred under the auspices of a state court small claims judgment that she secured against Plaintiff, and was likely related to his occupation of the property.  But the record of these events is far too sketchy for the Court to conclude the garnished funds are related to Defendant Michael Harrison's fraudulent conduct.  Therefore, Plaintiff can not recover the $900 from Defendant.

Plaintiff has not claimed nor proven damages associated with any loss of equity as a result of his loss of 6912 Petrie Street to foreclosure.  Were he still the owner of the property, he may have been able to show substantial damages when comparing the value of the property with a clean title to that with the boundary defects.[13]  And because Plaintiff will recover no damages for such a loss, Defendants' argument that the Court should reduce any damages award by the amount of payments Plaintiff failed to make on his first and second mortgages leading up to foreclosure misses the mark.  Also irrelevant in this analysis is any suggestion by Defendants that damages should be offset because Plaintiff

---

[13] Idaho follows the out-of-pocket rule to determine the damages to which Plaintiff is entitled.  *Koehler v. Stenerson*, 260 P.2d 1101, 1106 (Idaho 1953).  The out-of-pocket rule provides "that where a person is induced by fraud to purchase property his measure of damages is the difference between the contract price and the actual value of the property at the time of sale." *Id.* (citations omitted).

MEMORANDUM OF DECISION - 34

occupied the house for an extended time without paying mortgage payments.

Again, any value of Plaintiff's possession was offset, in the Court's view, by the

fact that Plaintiff lost the property as a result of Mr. Harrison's conduct.

Ms. Harrison played some part in the conduct of Defendants'

business and the transactions with Plaintiff.  She owned the property that Mr.

Harrison  developed; she accepted and transferred Plaintiff's promissory note; and

she participated in the transfer and closing of the sale to Plaintiff.  However, no

persuasive evidence was presented that she participated in making any

misrepresentation to Plaintiff, or that she was even present when the

misrepresentations were made.  In other words, while Ms. Harrison was involved

in the sale to Plaintiff, the evidence is insufficient to show that she was actively

involved in the fraudulent conduct upon which the transaction was based.  "This

Court has held that a claim will not be excepted from a spouse's bankruptcy

discharge unless the spouse actively participated in the conduct upon which the

nondischargeability finding is based."  *Saindon v. Gibson* (*In re Gibson*), 95

I.B.C.R. 169,172–173 (Bankr. D. Idaho 1995) (citing *In re McCarron*, 94 I.B.C.R.

52, 54 (Bankr. D. Idaho 1994); *In re Dobbs*, 90 I.B.C.R. 179, 193 (Bankr. D.

Idaho 1990)); *See also Tsurukawa v. Nikon Precision, Inc.* (*In re Tsurukawa*), 258

B.R. 192 (9th Cir. BAP 2001) (Holding "that a marital union alone, without a

finding of a partnership or other agency relationship between spouses, cannot

MEMORANDUM OF DECISION - 35

serve as a basis for imputing fraud from one spouse to the other").[14]  Therefore,
the Court will not award damages against Ms. Harrison solely based upon her
relationship with Michael Harrison.  If she is otherwise  responsible for those
damages, her obligation will not be excepted from  discharge.

In summary, Plaintiff is entitled to recover a total of $57,093.68
from Defendant Michael Harrison representing the amounts Plaintiff expended to
purchase the home, to improve the home and shop, and to compensate Plaintiff for
the shop property he never owned.  As these damages arose as a result of
Defendant Michael Harrison's fraud, the Court concludes this debt is excepted
from Mr. Harrison's discharge under § 523(a)(2)(A).

### B. Plaintiff's § 523(a)(6) Claim.[15]

Section 523(a)(2)(A) and § 523(a)(6) are not mutually exclusive.
*Japra v. Apte* (*In re Apte*), 180 B.R. 223, 230–31 (9th Cir. BAP 1995).

---

[14] Upon remand the bankruptcy court determined and the BAP affirmed that a
partnership relationship existed between the spouses allowing Mr. Tsurukawa's fraud to
be imputed to Ms. Tsurkawa.  *Tsurukawa v. Nikon Precision, Inc.* (*In re Tsurukawa*), 287
B.R. 515 (9th Cir. BAP 2002).  While evidence was presented that Ms. Harrison helps
Mr. Harrison with the business and signs documents for the land transactions, the parties
did not argue or establish that a partnership existed between Mr. and Ms. Harrison.

[15] Plaintiff alleged in his Amended Complaint that the willful and malicious
conduct at issue was Defendants' misrepresentation of the property lines, the location of
the shop and the location of driveway.  Am. Compl. at 14, Docket No. 15.  However,
during closing argument, Plaintiff's counsel argued the only conduct that was willful and
malicious was Mr. Harrison's failure to deed the shop property to Plaintiff.  On that basis,
the Court will correspondingly limit any relief to be granted on the § 523(a)(6) claim.

MEMORANDUM OF DECISION - 36

Section 523(a)(6) excepts from discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." "To be considered willful, the debtor must commit an act akin to an intentional tort under state law, and the debtor must intend the consequences or injury resulting from the act rather than just the act itself." *Farmers & Merchants State Bank v. Cracchiolo* (*In re Cracchiolo*), 00.2 I.B.C.R. 84, 87 (Bankr. D. Idaho 2000) (citing *Kawaauhau v. Geiger*, 523 U.S. 57, 61–62 (1998)); *See also Spokane Railway Credit Union v. Endicott* (*In re Endicott*), 254 B.R. 471 (Bankr. D. Idaho 2000). The act must be more than reckless or negligent. *Cracchiolo*, 00.2 I.B.C.R. at 87.

In a § 523(a)(6) action, the "willful injury requirement is met only when the debtor has a subjective motive to inflict injury or when the debtor believes that injury is substantially certain to result from his own conduct." *Carrillo v. Su* (*In re Su*), 290 F.3d 1140, 1142 (9th Cir. 2002); *see also Dominguez v. Elias* (*In re Elias*), 03.4 I.B.C.R. 243, 245–46 (Bankr. D. Idaho 2003). "A 'malicious' injury involves '(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse.'" *Su*, 290 F.3d at 1146–47 (quoting *In re Jercich*, 238 F.3d 1202, 1209 (9th Cir. 2001)); *Elias*, 03.4 I.B.C.R. at 246.

Mr. Harrison's conduct in failing to deed the shop property to Plaintiff was willful. When Defendant failed to deed the shop property to

MEMORANDUM OF DECISION - 37

Plaintiff, injury to Plaintiff was substantially certain to occur.  Defendant knew that by not transferring this property to Plaintiff, Plaintiff's home would violate the City's setback requirements because Defendant knew the shop property and 6912 Petrie were located on different lots.  Defendant also knew that Plaintiff would be purchasing property without receiving what he had bargained for.

Defendant's failure to deed the shop property to Plaintiff was also malicious.  Plaintiff was assured by Defendant that the shop property could easily be transferred to Plaintiff after closing of the property sale.  Not obtaining title to the shop property caused Plaintiff substantial injury, because he paid the full purchase price without receiving all the property to which he was entitled.  Without title to the shop property in turn created setback violations because the house at 6912 Petrie. was therefore located too close to the lot line.

The only damage proved by Plaintiff resulting from Defendant's willful and malicious conduct in failing to deed the shop property was that Plaintiff was deprived of the value of the shop property.   Plaintiff may recover this amount from Mr. Harrison, and this debt will be excepted from discharge pursuant to § 523(a)(6).

### Conclusion

Defendant Mr. Harrison fraudulently represented the boundaries of the property to Plaintiff so that Plaintiff would purchase it.  Such conduct also

MEMORANDUM OF DECISION - 38

caused willful and malicious injury to Plaintiff.  Defendant's conduct caused

Plaintiff to be damaged in the amount of  $57,093.68.  Defendant's liability for

this amount is excepted from discharge in Mr. Harrison's bankruptcy pursuant to

11 U.S.C. § 523(a)(2)(A).  Of the $57,093.68, damage award $2,500 is also

excepted from discharge pursuant to 11 U.S.C. § 523(a)(6).

MEMORANDUM OF DECISION - 39

Counsel for Plaintiff shall promptly submit an appropriate judgment for entry by the Court.  Counsel for Defendants shall approve the form of that judgment.

Dated:  February 10, 2006

_____
Honorable Jim D. Pappas
United States Bankruptcy Judge

MEMORANDUM OF DECISION - 40